UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

KENDELL R. THOMPSON                          CIVIL ACTION

VERSUS                                       CASE NO. 12-0059

SOCIAL SECURITY ADMINISTRATION               SECTION: G (2)

<u>ORDER AND REASONS</u>

Before the Court is the Objections to the Findings and Recommendation of the United States Magistrate Judge,[1] wherein Kendell R. Thompson ("Thompson") requests that the case be reviewed *de novo* and the claim be remanded to the Administrative Law Judge ("ALJ") pursuant to 42 U.S.C. § 405(g) for a new hearing.  Having considered the objections, the magistrate judge's findings and recommendation, the ALJ's decision, the record, and the applicable law, the Court will vacate the ALJ's decision and remand the matter for a new hearing.

## I.  Background

### A.  Procedural Background

On March 16, 2010, Kendell R. Thompson ("Thompson") filed applications for disability insurance benefits ("DIB") and supplemental security income benefits ("SSI") under Title II and XVI, respectively, of the Social Security Act (hereinafter, the "Act"),[2] alleging disability on the basis of injuries sustained in a car accident in January of 2010, residual back pain following a lumbar fusion, deafness in his left ear, partial deafness in his right ear, a reading disorder, and

---

[1] Rec. Doc. 18.

[2] 42 U.S.C. §§ 405(g), 423, 1381(a).

mild mental retardation.[3]  After his applications were denied by the Commissioner of the Social Security Administration (the "Commissioner"), Thompson requested a hearing before an Administrative Law Judge ("ALJ"), which was held on April 18, 2011.[4]  On July 25, 2011, the ALJ issued a decision denying Thompson's applications for benefits.[5]

The ALJ's decision became the final decision of the Commissioner for purposes of this court's review after the Appeals Council denied review on November 8, 2011.[6]  On September 9, 2012, Thompson filed a complaint seeking judicial review pursuant to Section 405(g) of the Act,[7] and this matter was referred to a United States Magistrate Judge pursuant to 28 U.S.C. § 636(b) and Local Rule 73.2(B).  On March 12, 2012, the Social Security Administration (the "Administration") answered the complaint.[8]

On April 23, 2012, Thompson filed a motion for summary judgment[9] and memorandum in support, and the Administration timely filed a response.[10]  After a review of the briefs and the record of the proceedings before the Administration, United States Magistrate Judge Joseph C. Wilkinson, Jr. issued his Findings and Recommendation (hereinafter, the "Report")[11] on August 13, 2012.  Thompson timely filed objections on August 22, 2012.[12]

---

[3] Rec. Doc. 15-2 at p. 2.  *See also* Rec. Doc. 17 at p. 1 (citing Tr. 137-41, 181).

[4] *Id.* (citing Tr. 23-55).

[5] *Id.* at p. 1 (citing Tr. 11-18).

[6] *Id.* (citing Tr. 1-5).

[7] Rec. Doc. 1.

[8] Rec. Doc. 9.

[9] Rec. Doc. 15.

[10] Rec. Doc. 16.

[11] Rec. Doc. 17.

[12] Rec. Doc. 18.

## B.  Factual Background

### 1. Kendell Thompson's Testimony

Thompson testified that he lives with his mother, 17 year-old sister and 18 year-old brother in his mother's apartment in Gonzales, Louisiana.[13]  He claims to have completed the eleventh grade and had been in special education classes for everything except math. He stated that he sometimes needed someone to help him during class when he would get frustrated or be unable to answer the question.[14]  He testified that he had been through reading classes, but he has a problem remembering words.  When asked what the Louisiana Vocational Rehabilitation people had helped him to do, Thompson said he did not know because his mother was with him any time he went through anything, and people would talk to her because he could not understand what they were saying.  He stated that he never had any job training in a school.

Thompson testified that he had a problem with reading anything when he was working, but that his mother had already talked to the people with whom he worked and explained his problem to them, so they would try to make it easier for him.  He said he had learned woodworking at school, but it required knowing how to measure and too many other tasks that he could not do, because he has "problems with reading and stuff."[15]  He stated that he had finished the woodworking course.

Thompson said he does not work now, except that he cuts grass for anyone who calls him, and that he did so three to four times the previous week, making about $50 or $60.  He testified that he had worked as a fry cook at the Holiday Inn in Gonzales, which meant that he

---

[13] Rec. Doc. 17 at p. 6 (citing Tr. 28-29).

[14] *Id.* (citing Tr. 29-30).

[15] *Id.* at p. 7 (citing Tr. 30).

"fried seafood, cooked – mostly, I just pulled the food, whatever they needed, and dropped it."[16] He stated that this job ended when he was incarcerated for failure to pay a ticket. He said that his supervisor thought he did a "pretty good" job.  He testified that he is good with his hands, but has a problem with reading.

Thompson stated that he previously worked at Old Time Farm Supply, finding and loading hay or animal feed into customers' trucks.  He said he had no problem as long as he could recognize the bag of feed that was ordered, but "it was hard for [him] to catch on" if a customer asked for a particular brand or type of feed that he did not already know.[17]  Thompson testified that he lifted and carried 50 pounds at a time at that job, but he had "problems" doing so.  He said he was laid off from that job because business was slow and he had been the last one hired.  He stated that his supervisor had been happy with his work and that his work was "pretty good."[18]

Thompson did not recall having worked at a company called Culinary Provisions or Stanley Ware in 2006.[19]  He said he had worked at a family company "moving furniture and stuff," but it was not a full-time job.

Thompson testified that he is partially deaf in his left ear, wears hearing aids and can hear with the hearing aids.  He stated that he has pain in his back if he walks "from here to the parking lot," but the pain goes away when he sits down.  He said he can sit longer than he can stand or walk, and that his back hurts if he lies down for too long.[20]  He testified that he can walk or stand

---

[16] *Id.* (citing Tr. 31-32).

[17] *Id.* at pp. 7-8.

[18] *Id.* at p. 7.

[19] *Id.* (citing Tr. 33).

[20] *Id.* (citing Tr. 34).

for five to ten minutes before he has to stop, and that he has no problems with sitting down.  He said he can lie on his side without pain, but his back hurts if he lies on his stomach or back.  He stated that he feels pain immediately if he lifts more than five to ten pounds.  Plaintiff testified that he has not taken any medicine for his back in a long time, except that he sometimes takes a Goody's powder or Tylenol for pain.  He said the pain will come back instantly if he lifts anything or does "any kind of activities."[21]  He stated that he had not seen a doctor in some time, but could not remember how long.

Thompson said that, in a typical day, he cleans the house, cleans his room, washes dishes, goes grocery shopping with his mother and puts groceries away at home.  He testified that his back hurts if he walks for long.  He said he tries to alleviate the pain by leaning on the grocery cart or, if he cannot walk any more, he will sit in the car until his mother comes and then he will help to put the groceries in the car.  He stated that he enjoys "messing with horses" and will go to a friend's house to "mess with them, feed them, and stuff," but does not ride them.[22]

Thompson testified that he has problems sleeping because of pain if he lies on his back or stomach. He said he lies on his side and tosses and turns all night.  He stated that he can drive and will do so whenever his mother lets him.  He said he has no problems with driving.

Thompson stated that he was in special education classes in school and that he had to repeat a grade, which he thought was the eighth grade.  He testified that he reads his mail because he can recognize words that he has seen over the years, but he cannot spell the word if asked.  He said his mother looks over his mail and tells him where things go and how things are

---

[21] *Id.* at p. 9 (citing Tr. 17).

[22] *Id.* (citing Tr. 36-37).

done.  He stated that he really depends on her, but knows he has to try to do things on his own because she will not always be there,[23] which is why he tried to work.

Thompson testified that his mother helped him get the jobs he had because she knew the people for whom he worked.  He said that she talked to them before he got the jobs, explained the problems he had with his back and reading, and filled out the applications for him.  He said he had to take a test for one job and that a woman read the questions to him and he answered orally.  He did not believe he would have been able to take the test or gotten the job if the woman had not done that for him.  He stated that, because his mother had talked to the manager before he started working, he could ask to sit down for a little while if his back was hurting, and the manager would let him sit until another order came up.[24]  He said that everyone in his job setting tried to help him when they could and that he would not have been able to work without the help.

Thompson testified that he took the driver's license test on a computer, but that someone read the questions aloud to him.  He said he did not talk to his doctor after his surgery and that the doctor talked to his mother.  He stated that "mostly everything" goes through his mother and that she helps him with reading.  He said his sister, brother or cousin will help him if his mother is not there.[25]

---

[23] *Id.* at pp. 9-10 (citing Tr. 38).

[24] *Id.* at p. 10 (citing Tr. 39-40).

[25] *Id.* (citing Tr. 40).

### 2. *Dionne Michelle Thompson's Testimony*

Thompson's mother, Dionne Michelle Thompson, testified that he lives with her and that she helped him obtain every job he had.[26]  She said she was already working at the Holiday Inn and knew the owner/manager of the restaurant there.  She explained her son's situation to the owner and told him that her son was a very good worker, but was unable to read.  She told the owner that her son could not be a busboy or waiter, the positions that the owner needed filled, because his reading and spelling ability are so low he could not take orders or write anything.  She said that the owner agreed to try Thompson as a fry cook or dishwasher and started out giving him small orders to see how he did, and he did fine. She testified that her son was able to recognize and memorize some of the orders, and that someone in the kitchen would help him when he did not recognize something.  She stated that he would fill in as a dishwasher because it did not require any writing or technical skill, just loading the racks and pushing a button.[27]  She said the owner tried to keep Thomspon working as long as he could and during rush hours, when he could not function at a fast pace, the owner would switch him away from the dishwasher or send him home after four to five hours.

As for Thompson's job at Old Town Farm Supply, Ms. Thompson testified that she took her son there, talked to the people, and helped him fill out the application.  She said he has memorized his name, address and telephone number and could fill out that portion of the application, but she filled out the rest.  She stated that Thompson was given a job in the feed

---

[26] *Id.* (citing Tr. 42-43).

[27] *Id.* at p. 11 (citing Tr. 43-44).

area, which did not require any reading, but was "just hay," cleaning up, bringing different feed items to the customers and loading their trucks.[28]  She said he had no problems doing that job.

Thompson's mother stated that his job for Culinary Provisions or Stanley Ware in 2006 was working for Popeye's, where she knew the manager.  She testified that her son was a fry cook who "just dropped chicken."[29]

Ms. Thompson stated that her son was placed in special education in fifth grade and stayed in it throughout his schooling. She said she helps him read and take care of his mail and that she fills out a money order if he needs to pay a bill.  She testified that Thompson had never obtained a job without her help, and she does not think that he could do so on his own.  She stated that each employer was aware of his limitations before he started working, and that his employer at Popeye's "definitely made accommodations for him, because he could not keep up with the pace."[30]  She said she did not know if the employer made similar accommodations for any other employees.

Thompson's mother stated that she told employers that her son is very good with his hands and would do well in a maintenance job.  However, she said no one would hire him for a maintenance job because of the written slips that have to be completed and instructions he would have to read to know where to go and what to do, which he could not do.  She said he could not perform basic reading and writing.[31]

---

[28] *Id.* at pp. 11-12 (citing Tr. 44).

[29] *Id.* at p. 12.

[30] *Id.* (citing Tr. 45-46).

[31] *Id.* (citing Tr. 46).

Ms. Thompson testified that her son had a spinal fusion, but he still has back pain.  She stated that he was in a car accident in January 2010 and had about $32,000.00 in medical bills. She said she was trying to apply for Medicaid for him.[32]

Ms. Thompson also explained that she obtained the jobs for him because of people she knew.  She said that Popeye's and other fast food places change management frequently and that if a new manager comes in and wants to put Thompson at the front counter as a cashier taking orders, he would be unable to do the job and would be suspended.  She testified that he was never hired or worked as a dishwasher, but that dishwashing was part of his job as a fry cook.[33] She testified that, if the job got too busy, he would be moved to washing dishes or would be sent home.[34]

### 3. *Vocational Expert Testimony*

A vocational expert, Thomas G. Mungall, III, ("Mungall") testified at the hearing that Thompson's past relevant work as a store laborer at a feed store is medium work with an SVP level of two.[35]  He opined that Thompson's jobs at the Holiday Inn and Popeye's have some elements of a fast foods cook, but are more likely classified as a cook's helper, which is also a

---

[32] *Id.* at p. 13 (citing Tr. 47).

[33] *Id.* (citing Tr. 53).

[34] *Id.* (citing Tr. 53-54).

[35] *Id.* at p. 14 (citing Tr. 48-49).  "SVP" means "specific vocational preparation" level, which is defined in the [Dictionary of Occupational Titles] as "the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation."  Dictionary of Occupational Titles, App. C, p. 1009 (4th ed. 1991).  An SVP level of 2 means "anything beyond a short demonstration up to and including 1 month."  *Id.*  The Dictionary of Occupational Titles lists a SVP time for each described occupation.  *Policy Interpretation Ruling : Titles II & XVI: Use of Vocational Expert & Vocational Specialist Evidence, & Other Reliable Occupational Info. in Disability Decisions*, SSR 00-4p, 2000 WL 1898704 at *3 (Dec. 4, 2000).  Using the skill level definitions in 20 C.F.R. §§ 404.1568 and 416.968, unskilled work corresponds to an SVP of 1-2.

medium job with an SVP of two, as is the job of dishwasher.  He stated that all of these were unskilled jobs.

Mungall testified that an employee is expected to work eight hours per day, five days per week, and would be subject to termination for excessive absenteeism if he was unable to complete his shift at least one day per week because of coming in late or leaving early.  He said that an employee would be terminated for excessive absenteeism if he missed three or more days of work per month.[36]

Mungall stated that Thompson's past relevant jobs could be done with very low to no reading abilities, if other people were there to help direct the work.  He testified that all three of the jobs required level one language ability, which is the lowest level.  However, he explained that "literacy is pretty much presupposed even for level one."  Having heard the testimony of Thompson and his mother that Thompson was able to memorize his jobs, the vocational expert opined that such an adaptation was not unreasonable or atypical and is often seen in those types of jobs, even with people who had finished college but cannot actually read.

Upon questioning by Thompson's attorney, Mungall stated that the Dictionary of Occupational Titles says, regarding general education development, that level one of language development requires a person to recognize the meaning of 2,500 two- or three-syllable words; read at a rate of 95 to 120 words per minute; compare similarities and differences between words and between series of numbers; and write simple sentences containing subject, verb and object, and series of numbers, names and addresses.[37]  He said that the Dictionary of Occupational Titles presupposes literacy at level one even for unskilled jobs, because there is no level zero.

---

[36] Rec. Doc. 17 at p. 14 (citing Tr. 49).

[37] *Id.* at p. 15 (citing Tr. 50-51).

The vocational expert testified that he has seen the job of dishwasher as it is performed in the workplace, and he actually performed it himself when he was in the Marine Corps.[38]  He stated that the job requires no reading whatsoever, despite the Dictionary of Occupational Titles requirement of level one language skills, because the Dictionary of Occupational Titles has no level zero.[39]  He reiterated that, based on his own experience as a dishwasher and having done "plenty of surveys as far as labor market work . . . and job analysis of jobs that are required of dishwasher, . . . there's no reading required."[40]  In reference to the lack of a level zero in the Dictionary of Occupational Titles, he noted that the Dictionary of Occupational Titles "is frequently wrong."[41]

### 4.  Psychological Evaluation

Cary N. Mack, Ph.D. and Alicia Pellegrin, Ph.D. conducted a psychological evaluation of Thompson on March 11, 2008 for Louisiana Rehabilitation Services.   According to the evaluation, Thompson has a verbal IQ score of 64, a performance IQ score of 90, and a full scale IQ score of 75.[42] Drs. Mack and Pellegrin concluded that Thompson's "intellectual level was found to fall within the Borderline range, with marked variability between verbal and nonverbal abilities."[43]  Despite his "Very Low" verbal IQ score of 64, his performance IQ score of 90 "was significantly higher, within the Average range.  Together, the scores contribute to his overall Full

---

[38] *Id.* at p. 15 (citing Tr. 51).

[39] *Id.* (citing Tr. 51-52).

[40] *Id.* (citing Tr. 52).

[41] *Id.* (citing Tr. 52-53).

[42] *Id.* at p. 20 (citing Tr. 230, 232); Rec. Doc. 10-2 at p. 16.

[43] Rec. Doc. 17 at p. 23 (citing Tr. 232).

Scale IQ score [of 75] falling into the Borderline range."[44]   The psychologists noted that Thompson has "a major deficit in language skills" and "learns more effectively via nonverbally mediated tasks than via verbally mediated ones."   They found that he could not read or write, although "he recognizes many common words in print," and that his math calculation score was within the borderline range.[45]   The doctors opined that Thompson has a "severe learning disability" in reading, spelling and math.  Drs. Mack and Pellegrin stated that Thompson has "the nonverbal learning skills and motivation to obtain training in a construction related trade, provided the training and job demands do not require extensive reading, writing, or math."[46]   Their diagnoses were severe dyslexia, dysgraphia, and dyscalculia and overall borderline intellect, with a Global Assessment of Functioning ("GAF") score[47] of 65.  "A GAF score of 61-70 reflects mild symptoms or 'some difficulty' in those areas, but the individual 'generally function[s] pretty well.'"[48]

## II.  The Objections

Thompson's objections raise alleged errors of both the ALJ and the magistrate judge.  Four of these objections relate to errors allegedly made by the ALJ.  First, Thompson contends that the ALJ failed to properly analyze the listed impairment of mental retardation, because she

---

[44] *Id.* at pp. 16-17 (citing Tr. 230).

[45] *Id.* at p. 17 (citing Tr. 230).

[46] *Id.* (citing Tr. 232).

[47] A GAF score represents "the clinician's judgment of the individual's overall level of functioning."   Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed., text rev. 2000).  The GAF scale ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with clear expectation of death).  *Id.* at 34.

[48] *Sims v. Barnhart*, 309 F.3d 424, 427 n. 5 (7th Cir. 2002) (quoting Am. Psychiatric Assoc., Diagnostic and Statistical Manual of Mental Disorders 30, 32 (4th ed. 1994)).

did not adequately "address the evidence which establishes the existence of mental retardation as reflected by the proof of deficits in adaptive functioning and the evidence which meets the diagnostic description in listing 12.05 of 20 C.F.R. Part. 404, Subpart P, Appendix 1."[49]   Second, Thompson contends that the ALJ failed to properly develop the record regarding the diagnostic requirement necessary for a finding of mental retardation when confronted with a wide divergence between the verbal and performance scores.[50]   In particular, the ALJ disregarded the policy of the Commissioner to use the lowest score when only one of the three scores reported on Wechsler intelligence testing reflects functioning in the range of mental retardation.[51]   Third, Thompson argues that the ALJ improperly rejected his allegations of pain and restriction attributable to an automobile accident without an assessment of his credibility.[52]   Fourth, Thompson contends that the ALJ erred in failing to reference any one of the four standards for measuring deficits in adaptive functioning set forth by the four major professional organizations recognized by the Administration.[53]

The remaining three objections relate to the magistrate judge's recommended findings. First, Thompson contends that the Magistrate Judge Wilkinson erred in finding that the ALJ had the discretion in this case to reject the verbal IQ score of 64, because there is no evidence in the record questioning the validity of the IQ scores.[54]   Thompson notes that there was only one mental examination conducted by Drs. Mack and Pellegrin, and the report concluded that the test

---

[49] Rec. Doc. 18 at p. 1

[50] *Id.* at p. 2.

[51] *Id.* at p. 3.

[52] *Id.* at p. 2.

[53] *See* Rec. Doc. 18 at p. 7.

[54] *Id.* at p. 2 (objecting to Report, Rec. Doc. 17 at p. 27).

results could be accepted as an accurate assessment of current function.[55]   Therefore, in the absence of other testing or evaluations by mental health professionals questioning the validity of the IQ scores, Thompson maintains that the ALJ could not reject the scores as invalid.[56]   Next, Thompson argues that the magistrate judge improperly discredits the testimonial evidence on the basis that "whether an impairment or combination of impairments meets a Listing is a medical question that can be answered only by medical evidence."[57]   In particular, Thompson maintains that the ALJ should have considered the testimony that he "participated in special education, and that he was only successful in holding jobs that involved employer accommodation."[58] Thus, Thompson contends that this testimonial evidence should have been considered to support a finding of deficits in adaptive functioning.[59]   Finally, Thompson objects to the magistrate judge's finding that "the record contained sufficient medical evidence to obviate any need to acquire additional medical evidence."[60]   Thompson contends that because "a reasonable suspicion of mental retardation was created," the ALJ had a "duty to fully and fairly develop the facts."[61]

---

[55] *Id.*

[56] *Id.* at p. 2.

[57] *Id.* at p. 6 (citing Report, Rec. Doc. 17 at p. 17).

[58] *Id.*

[59] *Id.* at p. 7.

[60] *Id.* at pp. 7-8 (citing Report, Rec. Doc. 17 at p. 29).

[61] *Id.* at p. 8 (quoting *Mapps v. Astrue*, No. 3:09-CV-2226-O-BH, 2010 U.S. Dist. LEXIS 47388, at *28 (N.D. Tex. Apr. 30, 2010)).

### III.  Law and Analysis

#### A.  Standards on Review

##### 1.  Review of a Magistrate Judge's Report

United States Magistrate Judges are granted authority to hear both dispositive and non-dispositive matters.[62]  In reviewing matters decided by a magistrate judge, the district court's standard of review is governed by Federal Rule of Civil Procedure 72, which differentiates between dispositive and non-dispositive matters.  For matters which are dispositive of a claim or defense, the district court performs a *de novo* review of the magistrate judge's recommended disposition.[63]  Because the magistrate judge's recommendation is to dismiss Thompson's complaint with prejudice,[64] the Court will review Magistrate Judge Wilkinson's Findings and Recommendation *de novo*.[65]

##### 2.  Review of Commissioner's Final Decision on SSI and DIB Benefits

Appellate review of the Commissioner's denial of SSI and DIB benefits[66] is limited to determining whether the decision is supported by substantial evidence in the record and whether the proper legal standards were used in evaluating the evidence.[67]  "Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind

---

[62] 28 U.S.C. § 636(b).

[63] Fed. R. Civ. P. 72(b).

[64] Rec. Doc. 17.

[65] *See Spencer v. Apfel*, No. 97-1872, 1998 WL 113940 (E.D. La. Mar. 11, 1998) (Clement, J.).

[66] The relevant law and regulations governing a claim for DIB are identical to those govnering a claim for SSI. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); *Hollis v. Bowen*, 837 F.2d 1378, 1382 n. 3 (5th Cir. 1988).

[67] *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005); *Waters v. Barnhart*, 276 F.3d 716, 716 (5th Cir. 2002); *Loza v. Apfel*, 219 F.3d 378, 390 (5th Cir. 2000); *Villa v. Sullivan*, 895 F.2d 1019, 1021 (5th Cir. 1990).

might accept as adequate to support a conclusion."[68]  The Court must review the whole record to determine if such evidence exists.[69]  However, the Court must not reweigh evidence, retry the issues *de novo*, or substitute its judgment for the Commissioner's even if the evidence weighs against the Commissioner's decision.[70]  "It is the responsibility of the Commissioner to determine issues of credibility and to draw inferences from the record evidence.  Indeed, the resolution of conflicts in the evidence is for the Commissioner, not the courts."[71]  The ALJ is entitled to make any finding that is supported by substantial evidence, regardless of whether other conclusions are also permissible.[72]

### B.  Law Applicable to Qualification for SSI and DIB

To be considered disabled and eligible for SSI or DIB, Thompson must show that he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."[73]  The Commissioner has promulgated regulations that provide procedures for evaluating a claim and determining disability.[74]  The regulations include a five-step evaluation process for determining whether an impairment constitutes a disability, and the five-step inquiry terminates if the Commissioner finds at any step that the claimant is or is not disabled.[75]  The claimant has the

---

[68] *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Perez*, 415 F.3d at 461; *Loza*, 219 F.3d at 393; *Villa*, 895 F.2d at 1021-22 (quoting *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983); *Randall v. Sullivan*, 956 F.2d 105, 109 (5th Cir. 1992)).

[69] *Singletary v. Bowen*, 798 F.2d 818, 822-23 (5th Cir. 1986).

[70] *Newton v. Apfel*, 209 F.3d 448, 452 (5th Cir. 2000); *Pierre v. Sullivan*, 884 F.2d 799, 802 (5th Cir. 1989) (citing *Davis v. Schweiker*, 641 F.2d 283, 285 (5th Cir. Unit B Apr. 1981)).

[71] *Duhe v. Barnhart*, No. 04-0339, 2004 WL 2988499 (E.D. La. Dec. 15, 2004) (Barbier, J.).

[72] *See Arkansas v. Oklahoma*, 503 U.S. 91 (1992).

burden of proof under the first four parts of the inquiry, and if he successfully carries this burden, the burden shifts to the Commissioner at step five to show that the claimant is capable of engaging in alternative substantial gainful employment, which is available in the national economy.[76]

The court "weigh[s] four elements of proof when determining whether there is substantial evidence of disability: (1) objective medical facts; (2) diagnoses and opinions of treating and examining physicians; (3) the claimant's subjective evidence of pain and disability; and (4) his age, education, and work history."[77]

---

[73] 42 U.S.C. § 423(d)(1)(A).

[74] 20 C.F.R. §§ 404.1501 to 404.1599 & Apps., §§ 416.901 to 416.998 (2008).

[75] *Id.* §§ 404.1520, 416.920; *Perez*, 415 F.3d at 461. The five-step analysis requires consideration of the following:

First, if the claimant is currently engaged in substantial gainful employment, he or she is found not disabled. 20 C.F.R. §§ 404.1520(b), 416.920(b).

Second, if it is determined that, although the claimant is not engaged in substantial employment, he or she has no severe mental or physical impairment which would limit the ability to perform basic work-related functions, the claimant is found not disabled. *Id.* §§ 404.1520(c), 416.920(c).

Third, if an individual's impairment has lasted or can be expected to last for a continuous period of twelve months and is either included in a list of serious impairments in the regulations or is medically equivalent to a listed impairment, he or she is considered disabled without consideration of vocational evidence. *Id.* §§ 404.1520(d), 416.920(d).

Fourth, if a determination of disabled or not disabled cannot be made by these steps and the claimant has a severe impairment, the claimant's residual functional capacity and its effect on the claimant's past relevant work are evaluated. If the impairment does not prohibit the claimant from returning to his or her former employment, the claimant is not disabled. *Id.* §§ 404.1520(e), 416.920(e).

Fifth, if it is determined that the claimant cannot return to his or her former employment, then the claimant's age, education, and work experience are considered to see whether he or she can meet the physical and mental demands of a significant number of jobs in the national economy. If the claimant cannot meet the demands, he or she will be found disabled. *Id.* §§ 404.1520(f)(1), 416.920(f)(1). To assist the Commissioner at this stage, the regulations provide certain tables that reflect major functional and vocational patterns. When the findings made with respect to a claimant's vocational factors and residual functional capacity coincide, the rules direct a determination of disabled or not disabled. *Id.* § 404, Subpt. P, App. 2, §§ 200.00-204.00, 416.969.

[76] *Perez*, 415 F.3d at 461; Newton, 209 F.3d at 453.

[77] *Martinez v. Chater*, 64 F.3d 172, 174 (5th Cir. 1995).

17

### C.  Analysis of the ALJ's Decision

#### 1.  Construction of Listing 12.05(C)

The ALJ found at step three of the sequential evaluation that Thompson does not meet Listing 12.05(C)[78] for mental retardation.  Thompson argues that this finding is not supported by substantial evidence because the ALJ did not explain her reasons sufficiently, failed to obtain additional evidence from a medical expert, did not adequately consider his participation in special education classes or the testimony about employer accommodations, and failed to recognize the evidence of deficits in his adaptive functioning or other evidence that he meets the diagnostic description of Listing 12.05(C).

Listing 12.05 contains "an introductory paragraph with the diagnostic description for mental retardation" and "four sets of criteria (paragraphs A through D)"[79]:

> 12.05 Mental retardation: Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; *i.e.*, the evidence demonstrates or supports onset of the impairment before age 22.
> The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.
> . . . .
> C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function.[80]

The diagnostic description provided in Listing 12.05 has a substantive requirement (significantly subaverage intellectual functioning with deficits in adaptive functioning), a temporal requirement (initially manifested during the developmental period; i.e. the evidence demonstrates or supports

---

[78] Although the ALJ's decision considered all four subparagraphs of Listing 12. 05 and found that Thompson satisfied none of them, Thompson argues only that he meets Listing 12.05(C), not (A), (B) or (D).

[79] *Randall*, 570 F.3d at 653 (quoting [20] C.F.R. Listing 12.00(A)).

[80] *Id.* (quoting Listing 12.05).

onset of the impairment before age 22), and a severity requirement (the four severity criteria  in paragraphs A, B, C, and D).[81]  In *Randall*, the United States Court of Appeals for the Fifth Circuit held that in addition to meeting the severity requirement set forth in paragraph C of Listing 12.05 by demonstrating a valid IQ score of 70 or less and an additional significant work-related limitation of function, a claimant must make an independent showing of "significantly subaverage general intellectual function with deficits in adaptive function initially manifested during the developmental period."[82]   Therefore, it is clear that Thompson must satisfy the substantive, temporal, and severity requirements by demonstrating that he has a valid IQ score below 70 with a significant work-related limitation of function, deficits in adaptive functioning, and impairments manifested during the developmental period to be considered disabled under Listing 12.05(C).[83]

### 2. The Severity Requirement of Listing 12.05(C)

Thompson argues that he meets the severity requirement of Listing 12.05(C) because he has a valid verbal IQ score of 64 and hearing loss.[84]  Although the ALJ recognized that such a score appears "[o]n its face" to satisfy paragraph C of the listing, she concludes that Thompson does not satisfy the description of mental retardation in the listing because he has "a performance IQ of 90 and a full scale IQ of 75, with a diagnosis of borderline intellect, not mental

---

[81] *Id.* (citing Listing 12.05) (internal citations omitted).

[82] *Id.* at 659-660.

[83] Here, the parties do not contest the temporal requirement, because the testing was performed during the developmental period when Thompson was age 21.  *See* Rec. Doc. 18 at p. 5 n. 1.

[84] Rec. Doc. 10-2 at p. 15.

retardation."[85]  Having concluded that Thompson could not satisfy Listing 12.05(C) on the basis of his IQ scores, the ALJ did not proceed to consider whether Thompson's hearing loss constituted an additional significant work-related limitation of function.

The ALJ, without explanation, disregarded a policy of the Commissioner to use the lowest score when only one of the three scores reported on Wechsler intelligence testing reflects functioning in the range of mental retardation.[86]  Here, the report of Drs. Mack and Pellegrin indicates that Thompson had a valid verbal IQ score of 64, a performance IQ score of 90, and a full scale IQ score of 75.  Drs. Mack and Pellegrin explicitly state that Thompson's "Performance IQ score was significantly higher" than the verbal IQ score, in which case the policy of the Commissioner is to rely on the valid verbal IQ score of 64 because it reflects functioning in the range of mental retardation.  Thus, the Court finds that the ALJ did not apply the appropriate legal standards, because she disregarded a policy of the Commissioner without providing any reasons.

Magistrate Judge Wilkinson affirmed the ALJ's decision denying benefits based, in part, on finding that the ALJ had the discretion to reject Thompson's IQ scores as invalid and unreliable.  In support of this position, Magistrate Judge Wilkinson cites *McGee v. Astrue*,[87] wherein the United States Court of Appeals for the Eighth Circuit stated:

> The Commissioner is not, however required to accept a claimant's IQ scores.
> Rather, the ALJ should examine the record to determine whether the proffered IQ

---

[85] *Id.* at p. 15.

[86] 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(D)(6)(c); *Sowell v. Astrue*, Civ. A. No. 10-01835, 2011 U.S. Dist. LEXIS 105275, at *35-37 (E.D. La. 2011) (Chasez, Mag. J.) (noting that the Regulations provide that where more than one IQ is customarily derived from the test administered, e.g., where verbal, performance, and full scale IQ's are provided in the Weschler series, the lowest of these is used in conjunction with 12.05).

[87] 291 Fed. App'x 783 (8th Cir. 2008).

> is reliable—that is consistent with the claimant's daily activities and behavior. An ALJ may reject IQ scores if they are inconsistent with the record.[88]

However, unlike *McGee*, this case does not involve unreliable IQ scores. The claimant in *McGee* had been "extensively examined by medical and mental health professionals over many years" and a psychologist ordered to examine the claimant by the ALJ was "the first, and the only, person suggesting any cognitive difficulty at all."[89] The Eighth Circuit further noted that the IQ scores were inconsistent with the claimant's prior history and present activities, because she took regular classes in school, no evidence showed that she struggled academically, she earned her GED after dropping out of school to have a baby, she maintained a home while raising five children, and she read for at least one hour each day.[90]

In contrast, there is no evidence by any medical or mental health professionals contradicting the valid verbal IQ score of 64 in Thompson's case. Indeed, Drs. Mack and Pellegrin noted that "Kendall was entirely cooperative . . . [and] [h]is results can be accepted as an accurate assessment of current functioning."[91] Furthermore, Drs. Mack and Pellegrin did not conclude, as the ALJ suggests, that Thompson was not mentally retarded, but merely that the full scale IQ of 75 was consistent with an overall "borderline intellect."[92] This conclusion with respect to the full scale IQ score does not impugn the validity of the verbal IQ score of 64, and the psychologists' report does not imply otherwise. Similarly, the testimony regarding Thompson's prior history and present activities do not constitute substantial evidence to find the IQ scores unreliable. Unlike the claimant in *McGee*, the evidence indicates that Thompson was

---

[88] *Id.* at p. 787 (internal citations omitted).

[89] *Id.*

[90] *Id.*

[91] Rec. Doc. 10-8 at p. 5.

[92] *Id.* at p. 4.

placed in special education classes in fifth grade, repeated multiple grades before dropping out of school, has not obtained his GED, has not obtained a job without his mother's assistance, cannot fill out job applications on his own, and appears to need his mother's help in his daily life.

While it is not permitted to reweigh the evidence, the Court finds that the ALJ did not apply the appropriate legal standards here nor is there substantial evidence in the record to support the ALJ's finding that Thompson's impairment does not meet the severity requirement of Listing 12.05(C).

### 2. The Substantive Requirement of Listing 12.05

Thompson also must demonstrate that he has "significantly subaverage general intellectual functioning with deficits in adaptive functioning,"[93] which were present prior to age 22.[94]   The ALJ concluded that Thompson "does not have adaptive deficits commensurate with mental retardation[,]" because he does household chores; maintains his personal living area; goes shopping with his mother; cuts grass for others; drives; maintained jobs as a cook, dishwasher, and store laborer; and can complete job applications with help.[95]

The Administration has recognized four major professional organizations dealing with diagnoses of mental retardation, and each of these organizations has developed its own standard for measuring deficits in adaptive functioning.[96]   However, the ALJ did not refer to any standard in assessing whether Thompson had deficits in adaptive functioning.  The Fifth Circuit has held

---

[93] *Randall*, 570 F.3d at 653 (quoting 20 C.F.R. Listing 12.05).

[94] The temporal requirement is not contested by the Commissioner, as the testing of Thompson was performed prior to age 22.  *See* Rec. Doc. 18 at p. 5 n. 1.

[95] Rec. Doc. 10-2 at p. 16.

[96] *See Miller v. Astrue*, No. 4:07-cv-2611, 2008 U.S. Dist. LEXIS 112699, at *12 (S.D. Tex. Sept. 8, 2008).

that the ALJ may rely on the clinical psychologist's specific analysis of the claimant's physical and mental capabilities, including the determination as to the claimant's adaptive functioning.[97] It does not appear from the ALJ's decision that she did in fact rely on any determination of Thompson's adaptive functioning contained in the psychological evaluation, given that there is no mention of Thompson's GAF score in the ALJ's decision.  Moreover, courts have found that the ALJ has a duty to adequately develop the record so that she can fully and fairly evaluate the case.[98]

The ALJ also does not address the significant evidence in the record that Thompson repeated three separate grades in addition to his participation in special education, his reading comprehension was at K .5 level, he could not keep pace at Popeye's Chicken, he required assistance from coworkers when working at Old Time Farm Supply, among other things.[99] Although the Court may not reweigh the evidence, it must ensure that the ALJ applied the proper legal standards and that substantial evidence supports the ALJ's finding that Thompson does not demonstrate the requisite deficits in adaptive functioning.  Although, the ALJ reiterates some of the testimony from Thompson and his mother, the ALJ does not provide an adequate rationale reflecting her consideration of any medical expert testimony or any particular standard applied in evaluating the deficits in adaptive functioning.   Therefore, the Court finds that the ALJ's decision is not supported by substantial evidence.

---

[97] *Randall*, 570 F.3d at 662.

[98] *Clifton v. Astrue*, Civ. A. 1:10-cv-00417, 2011 U.S. Dist. LEXIS 20549, at *22 (W.D. La. Feb. 8, 2011) (citing *James v. Bowen*, 793 F.2d 702, 705 (5th Cir. 1986)).

[99] *See* Rec. Doc. 18 at pp. 6-7.

## IV.  Conclusion

Having concluded that the ALJ did not adequately address Thompson's verbal IQ score, whether Thompson had an additional significant work-related limitation of function, or whether Thompson had significant deficits in adaptive functioning, the Court must vacate the decision and remand for additional proceedings at step three of the evaluation process.   Although Thompson contends that his allegations of pain and restriction, attributable to an automobile accident were improperly rejected without the assessment of credibility required by the regulations,[100] this objection relates to the ALJ's assessment of Thompson's residual functional capacity.   Therefore, the Court will not address whether the ALJ's assessment of Thompson's residual functional capacity was accurate, because it was only relevant at the fourth step of the evaluation process.  Accordingly,

**IT IS HEREBY ORDERED** that the decision is **VACATED** and the case is remanded to the ALJ pursuant to 42 U.S.C. § 405(g) for a new hearing, the taking of additional evidence, and more adequate consideration of the record.

**NEW ORLEANS, LOUISIANA**, this  8th  day of February, 2013.

**NANNETTE JOLIVETTE BROWN**
**UNITED STATES DISTRICT JUDGE**

---

[100] Rec. Doc. 18 at p. 2.